## BRYCE BROS. CO. v. SENECA GLASS CO.

(Circuit Court, N. D. West Virginia. August 22, 1905.)

1. PATENTS—PRIOR PUBLIC USE—MANUFACTURING MACHINE.
  Where a patent is for a manufactured article itself, designed for general use, a presumption arises that, when the inventor issues such article to the public, he regards it as a finished product, and, in case he does not apply for a patent within two years, abandonment of his purpose to do so may well be assumed; but where the invention is for a machine designed to produce articles, a different rule as to experimental use may well apply, and, although the articles produced may be perfect, the machine may not, and the sale of the product does not necessarily render the use of the machine a public use, where none are sold, and the use is entirely under the observation of the inventor.

2. SAME—INFRINGEMENT—ENGRAVING MACHINE.
  The Schrader patent, No. 592,920, for an engraving machine for etching glassware, was not anticipated, and discloses invention, nor is it invalid for prior public use; it being shown that the use of the machine prior to two years before application for patent was filed was experimental, and that frequent changes and improvements were made during the time. Also, *held* infringed by the machine of the Schiffbauer patent, No. 645,333.

## In Equity.

Suit instituted by the Bryce Bros. Company, assignee of Henry C. Schrader of letters patent No. 592,920, issued November 2, 1897, against the Seneca Glass Company, alleging infringement and praying injunction and accounting. The defendant company has by answer denied infringement, assailed the validity of the patent, and asserted its abandonment, anticipation, and prior use. The patent is for a machine with which to etch or engrave glassware, and can best be understood here, in the absence of the machine itself, by the drawings and specification of the patent itself, as follows:

The specification describes the invention as follows:

"This invention relates to certain new and useful improvements in engraving machines for engraving upon glass and other articles; and it has for its objects, among others, to provide a simple and cheap device for this purpose composed of few parts, those readily assembled and adjusted, and adapted for making different designs upon the articles operated upon. The base or support or table is provided with a plurality of ways radiating from the center, in which may be adjustably mounted the stands carrying the needle support and its operating mechanism, so that one, two, or more of the same may be caused to operate upon the article at the same time. The needle-supporting plate or frame is mounted for pivotal movement, the needle is adapted for adjustment upon said plate or support to give it the required height, and the plate is moved upon its pivot by an eccentric and suitable connections with the operating mechanism. Other objects and advantages of the invention will hereinafter appear in the following description, and the novel features thereof will be particularly pointed out in the appended claims:

"The invention is clearly illustrated in the accompanying drawings, which, with the letters of reference marked thereon, form a part of this specification, and in which Figure 1 is a side elevation, with a portion in vertical section. Fig. 2 is a view looking at right angles to Fig. 1, showing a front view of the machine. Fig. 3 is a plan of the table with the large gear and the horizontal shafts and their gears, the remaining portions of the device being removed. Fig. 4 is a horizontal section on the line, 4, 4, of Fig. 2. Fig. 5 is a horizontal section on the line, 5, 5, of Fig. 1. Like letters of reference indicate like parts throughout the several views.

"Referring now to the details of the drawings by letter, A designates the table, which may be supported in any desired position in any suitable manner, in this instance being shown as mounted upon the legs, a, braced by the horizontal brace-arms, a', which join the legs to the depending tubular portion, A', extending centrally from the under side of the table, as seen more clearly in Fig. 1. Upon the upper side of the table are the radial ways, B, which may be of any desired number, in this instance being shown as four, and these ways are dovetailed, as seen in Figs. 1 and 2. It will thus be seen that one, two, or more needles and their supporting and operating mechanisms may be employed for simultaneous or successive movement upon the article being operated upon. C is a large bevel-gear disposed at the center of the table and having the tubular shaft, C', mounted in the tubular de-

pending portion, A', of the table, as seen more clearly in Fig. 1; the said shaft near its upper end being provided with a conical portion, c, having a bearing in the correspondingly-shaped upper end, b, of the depending portion. A'. D is a shaft passed through the hollow shaft, C', and secured therein at any proper height by suitable means, as the set-screw, d, mounted in the said hollow shaft, as seen in Figs. 1 and 2, and engaging the shaft, D, so that the latter may be adjusted vertically, as may be required, and held in its adjusted position. At the upper end of this shaft, D, is the plate or support, E, fixedly mounted thereon so as to revolve therewith, and upon which is designed to be supported and held in any suitable manner the article, X, to be engraved. F and F' are shafts arranged at right angles to each other upon different planes, so as to cross without interference with each other, as seen in Figs. 1 and 3. These shafts are mounted in suitable bearings, f, on the table, as seen in Figs. 1 and 3, and each has one end extended and provided with any suitable means, as the crank-handle, f', by means of which the same may be rotated when desired. One shaft carries a bevel-pinion, $F^2$, meshing with the larger bevel-pinion, C, as indicated in Figs. 1 and 3, so that by rotation of said shaft the required rotary movement is given to the bevel-pinion, C, and consequently to the plate or support, E, carrying the glass or other article to be operated upon. Each of the shafts carries a bevel-pinion, $F^3$, which mesh with each other, as seen in Fig. 3, whereby the rotation of either shaft will drive the pinion C and also the other shaft, together with the needles connected with the shafts. Each needle and its carrier or support and operating mechanism is designed to be mounted and actuated by the movement of either of the shafts, but may be actuated independently of the other. It is adjustable radially to and from the work, and also vertically, so as to accommodate itself to the different sizes and styles or classes of articles operated upon.

"It being understood that each needle, needle support, and operating mechanism is the same, a description of the construction and operation of one will suffice for all. G represents the post or holder, provided with a foot, g, fitted to and adapted to slide in the dovetailed way, B, of the table. H is the head. This head has a tubular portion, which receives the vertical portion of the holder, G, and upon which it may be held in its adjusted positions by the set-screws or analogous means, g', as seen in Figs. 1 and 2. This head has the offset, I, in which is located the sleeve, J, which extends from the plate, K, so that the latter may have a movement as upon a pivot formed by said sleeve, J. Through this sleeve passes a shaft, L, which passes also through an opening in the plate, K, and carries a bevel-pinion, M, as illustrated best in Fig. 4. A washer, k, is placed upon the outer end of the sleeve, and a nut, l, engages the threaded end of the shaft, as seen in Fig. 4, and bears against said washer to hold the parts against endwise movement, but permits of their rotation. N is a shaft at right angles to the shaft, L, and carries a bevel-pinion, N', meshing with the bevel-pinion, M, as seen in Figs. 1 and 4. O is a shaft at right angles to the shaft, L, and carrying a bevel-pinion, O', meshing with the pinion, M, as seen in Figs. 1 and 4. This latter shaft, O, is hollow, and arranged within the same is the bent needle, P, which is urged to its work by the spring, P', retained within the said hollow shaft, as seen in Fig. 1. The shaft, O, has bearings in the ears or lugs, o, of the frame, $O^2$, from the rear side of which projects a pin or stud, Q, that works through the curved slot, Q', struck from the shaft, L, as a center, and upon the end of this stud or pin is a nut, q, as seen best in Fig. 4. On the outer end of the shaft, N, is a gear-wheel, R, which meshes with the gear-wheel, R', on the shaft, r, which gear in turn meshes with the gear, S, on the shaft, s, the gear-wheel, S, meshing with a larger gear-wheel, T, on the shaft, t, and this last gear-wheel, T, meshing with a gear-wheel, U, on the shaft, F', as seen clearly in Figs. 1 and 2; the arrangement of gears being such that they all continue in mesh, regardless of the vertical adjustment of the head, as also clearly seen in Fig. 2.

"The operation will be apparent. The glass or other article, X, is placed upon the board or support, E, and the shaft, F', being rotated, rotary movement is

imparted to the shaft, D, and the holder, E, thereon, and consequently the glass and the same rotation of said shaft, F', gives to the needle, through the medium of the gears and bevel-pinions above described, a rotary movement, causing it to engrave upon the glass the proper design. Proper adjustment of the needle-supporting frame, O², and to the head, H, is made to conform to the design required. In order to give the plate, K, and the needle carried thereby, an up and down movement radially of the work holder to produce different designs, the said plate is provided at its lower end with a vertical slot, k². In this slot works a pinion, V, carried by the eccentric, W, located on the shaft, w, which shaft is journaled in the lug, h³, projecting from the head, H, as seen in Figs. 1 and 5. This shaft, w, is provided at its outer end with a pinion, w', which meshes with a pinion, w², on the shaft, t. The shaft, t, is provided with the gear, T, whereby, when the shaft, F', is rotated, the movement therefrom will be transmitted to the eccentric, which, through the medium of its pinion working in the slot, causes the plate, K, to travel on its pivot formed by the sleeve, I, in a path radial to the work holder. When it is desired to engrave an ordinary scroll upon glass, this eccentric may be disconnected or thrown out of operative position. Modifications in detail may be resorted to without departing from the spirit of the invention or sacrificing any of its advantages. It will be understood that the articles to be engraved upon are covered with beeswax or the like, and the needles scratch the patterns in the wax, after which the article is placed in acid, which eats into the glass in the usual way.

"Having thus described my invention, what I claim as new, and desire to secure by letters patent of the United States, is:

"(1) In an engraving machine, a central rotating work holder, a table provided with a plurality of guideways extending radially from said holder, a plurality of tool holders supported in said guideways, and means for simultaneously actuating the several engraving tools, substantially as specified.

"(2) In an engraving machine, a central rotating work holder, a table provided with a plurality of guideways, tool holders slidably supported in said guideways, and means for simultaneously actuating said work holder and the several tool holders, substantially as specified.

"(3) In an engraving machine, a central rotating work holder, a table provided with radial guideways, a series of tool holders located in said guideways, a centrally disposed pinion, and shafts geared to each other and to said pinion to simultaneously operate a series of tools supported in said guideways, substantially as specified.

"(4) In an engraving machine, a table having radially disposed guideways, a central work holder, shafts mounted in bearings on said table and disposed at right angles to each other, and meshing gears on said shafts adjacent to their point of intersection, substantially as described.

"(5) In an engraving machine, a table having radially disposed guideways and shafts mounted in bearings on the table and disposed at right angles to each other, a centrally disposed pinion mounted in the table, a pinion on one of said shafts engaging therewith and means to drive one of said shafts by the movement of the other, substantially as described.

"(6) In an engraving machine, a table having radially disposed guideways, a centrally disposed, depending, tubular portion, a pinion having a tubular shaft mounted in the tubular portion, and a shaft extended within the shaft of the pinion, and carrying a support for the article to be operated upon, substantially as described.

"(7) In an engraving machine, a table having radially disposed guideways, a centrally disposed, depending, tubular portion, a pinion having a tubular shaft mounted in the tubular portion, a shaft extended within the shaft of the pinion and carrying a support for the article to be operated upon, and means for actuating said pinion and the engraving needle, substantially as described.

"(8) The combination with a post or holder and a moveable head secured thereto, of a plate pivotally mounted on said head to oscillate in a vertical plane, means for swinging said plate in a vertical plane upon its pivot, a

needle-holding frame supported from said plate, and gearing moveable with the head for actuating said needle, substantially as specified.

"(9) The combination with a post or holder and a head secured thereto, of a plate pivotally mounted on said head to oscillate in a vertical plane, means for oscillating said head, a needle-holding frame supported from said plate, and means operatively connected to rotate said needle simultaneously with the oscillation of said plate, substantially as specified.

"(10) The combination with a post or holder and a vertically adjustable head thereon, of a plate pivotally mounted on said head to travel in a vertical plane, an engraving needle supported on said plate, needle-operating mechanism, and means acting upon the lower portion of said plate to swing the same in a vertical plane, substantially as specified.

"(11) The combination with a post or holder and a vertically adjustable head thereon, of a plate pivotally mounted on said head to travel in a vertical plane, an engraving needle supported on said plate, needle-operating mechanism, means acting upon the lower portion of said plate to swing the same in a vertical plane, and a revoluble plate or work holder for supporting the article to be operated upon, substantially as specified.

"(12) The combination with a post or holder and a vertically adjustable head thereon, of a plate pivotally mounted on said head to travel in a vertical plane, an engraving needle supported on said plate, needle-operating mechanism, means acting upon the lower portion of said plate to swing the same in a vertical plane, a revoluble plate or work holder for supporting the article to be operated upon, and means for operatively connecting the rotating plate with the needle-operating mechanism, substantially as specified.

"(13) The combination with a post or holder and a head secured thereto, of a plate pivotally mounted to oscillate upon said head and provided with a vertical slot in the lower portion thereof, a needle-holding frame supported from said plate, means to rotate said needle, and an eccentric provided with a pin located in said slot to oscillate said plate, substantially as specified.

"(14) The combination with a post or holder and a head secured thereto, of a plate pivotally mounted on said head to travel in a vertical plane and provided with a vertical slot therein, an eccentric having a pin working in said slot, and needle-operating mechanism operatively connected with said eccentric, substantially as specified.

"(15) The combination with a post or holder and a head secured thereto, of a plate pivotally mounted on said head to travel in a vertical plane and provided with a vertical slot therein, an eccentric having a pin working in said slot, needle-operating mechanism operatively connected with said eccentric, and means for adjusting the needle in an arc of a circle on said plate, substantially as specified.

"(16) The combination with a table provided with radial guideways, of a post or holder having a foot adjustable in said guideways, a head adjustable on said post or holder, a plate pivotally mounted on said head to swing in a vertical plane, a train of gears carried by said head, a needle support upon said plate, and beveled pinions connected with said gears for operating the needle, substantially as specified.

"(17) The combination with a table provided with radial guideways, of a post or holder having a foot adjustable in said guideways, a head adjustable on said post or holder, a plate pivotally mounted on said head to swing in a vertical plane, a train of gears carried by said head, a needle support upon said plate, beveled pinions connected with said gears for operating the needle, and means for moving the lower end of the plate to and from the head, substantially as specified."

The machines used by defendant and claimed to be infringements, it appears, are built almost exactly after the drawings filed by Gustav Schiffbauer with his application, dated May 25, 1899, upon which on March 13, 1900, after the institution of this suit, letters patent No. 645,333 issued to him, and may well be illustrated by Fig. 1 of the drawings filed with his specification for such patent, now here given. The defendant's machines were all built for it by the said Gustav Schiffbauer and his brother Daniel.

The purpose of these machines is to take glass articles, such as tumblers, which have been protected first by a coating of wax, and by needles having different motions scratch through the wax in scrolls, lines, curves, etc., in other words, in different bands and patterns, so that the tumbler or other article can then be immersed in hydrofluoric acid, which attacks the glass exposed by the needles, leaving the article with the designed pattern engraved upon it. The history of the art shows progressive steps, from machines having one needle, capable of making a single band in one revolution of the glass article, to those having two, three, and four different bands by four different needles operating synchronously in one such revolution. The machines of both plaintiff and defendant are of the latter four-arm needle class.

The record shows that plaintiff's assignor, Henry C. Schrader, a machine builder, came from Germany to this country in 1879, and took employment with the Central Glass Company of Wheeling, W. Va., where he constructed in 1880, for that company, the first three-arm needle machine, called in the record sometimes the "Central Glass Company Machine," and at other times the "Band 70 Machine," from the number of the pattern which it engraved. No patent was ever issued upon this machine. While Schrader was connected with the Central Glass Company, it would seem that he was studying and experimenting upon improvements to this machine, involving the creation and successful operation of a four-arm needle one. In the employ of this same company, during this time, was another machinist, a German, who also came to this country in 1879, by the name of Conrad Kahbel. In 1883, Kahbel worked with and under Schrader in the building of one of these Central Glass Company machines. Schrader, it appears, in 1894, had made castings for a four-arm needle machine, which castings he disposed of to James Gaither, who employed Kahbel to construct a machine from them. This was the first four-arm needle machine constructed and is the one so frequently referred to in the record as the "Kuny Kahbel Machine." It differed from the machines in controversy, among other things, in that it had four short shafts with bevel pinions intermeshing on a horizontal plane, with another bevel pinion revolving the work holder, substantially in the center of the table, in the character of the gearing by which action was given to the needle arm, and in the character of the post to which the needle arm was attached. This Kuny Kahbel machine could, as claimed by defendant, turn out every class and variety of work that Schrader's later patented machine, in controversy here, could do, but, as claimed by plaintiff, was not practical or efficient, because of lost motion in the gearing of the shafts and needle arm, making the needles work nonsynchronously, because the wax from the work holder, dropping on the intermeshed bevel pinions, clogged the operation, and for some other not so material reasons.

Bakewell & Brynes, for plaintiff.
Charles A. Goodwin and Van Winkle & Ambler, for defendant.

DAYTON, District Judge (after stating the facts as above). If the patent in suit is to be upheld, I have no difficulty in determining that the machines used by defendant company are plain and palpable infringements. These machines were built for it by the Schiffbauers, and, as the evidence discloses, are made almost ex-

actly after the drawings filed by Gustav Schiffbauer with his application for patent No. 645,333, issued to him March 13, 1900. A comparison of these drawings and those of defendant's machines with those filed by Schrader with his patent convinces me that substantially the only changes Schiffbauer has made in his machine are these: He has substituted for the bevel gear or pinion of the patent, C, a worm wheel, C, engaging a worm wheel, $F^2$. Instead of the miter gears employed by Schrader, the spiral gear is used for connecting the cross-shafts. Instead of the dovetail radial guides in the table used by Schrader, radial slots, with bolts which guide and secure the plates carrying the posts, are used. In complainant's machine the oscillating plate is extended down to form a tailpiece upon which the eccentric acts. In defendant's machine the plate is shorter and is provided with an adjustable stem.

There is nothing in the record that shows these changes to involve anything whereby the utility or effectiveness of the machine is increased in any way. On the contrary, a strong presumption arises that they were made simply to avoid an otherwise exact duplication of the Schrader machine. The two do the same work, according to the same principle, the one, so far as shown, as effectively as the other, and the changes are merely mechanical. Under the circumstances, nothing is more natural than that this should be so. The Schiffbauers, who built defendant's machine, came from the coke ovens to Bryce Bros.' works to learn all they knew about etching machines from Schrader. Staying there four years, they then went from there direct to the defendant's factory and built its machines. They simply had absorbed Schrader's ideas and theories, and saw, what any ordinary mechanic would have seen, that several mechanical equivalents frequently exist to carry out the same mechanical principle or idea. One of the very able counsel for defendant, with commendable frankness, has virtually admitted this by saying, at page 32 of his brief:

"We do not believe that the Schiffbauer patent is valid, in view of the prior art as disclosed by the Central Glass Company machine, the Kuny Kahbel, and the Schrader machine, or would have been valid if the Schrader machine had not been in existence; but certainly the difference in the mechanical movements and in the arrangement of parts, as illustrated in the drawings of the Schiffbauer patent, are apparently more marked as compared with the drawings of the patent in suit than are those of the patent in suit as compared with the drawing illustrating the construction of the Kuny Kahbel machine."

In other words, he believes both the Schiffbauer and Schrader patents to be invalid, because of the prior art as exhibited by the Central Glass Company and Kuny Kahbel machines. It is therefore not necessary to dwell upon the question of infringement, but we may well pass to the consideration of the crucial one, as to whether, considering the state of the prior art, Schrader's patent presents anything new, novel, and patentable.

On this subject of the validity of this patent, a vast amount of conflicting, technical, perplexing, and almost hypercritical discussion and opinion has been indulged, both in the testimony and in the able and exhaustive arguments and briefs of counsel. Expert Osborn for defendant, after setting forth minutely his superior

qualifications, mechanical education, and great experience, takes up in detail the patent claims, and shows to his own entire satisfaction that none of them are new; that all of them have been applied, under one form or another, in some 22 previous patents, and in 2 other machines, not patented, to wit, the Central Glass and Kuny Kahbel ones; that the whole machine is only "an aggregation of well-known mechanical elements, that any skilled designer would bring to his use in the construction of such a machine." This certainly, under ordinary conditions, would settle the matter beyond peradventure; for this witness is a very wise and learned man in these things, and very positive. But expert Clarke appears for the plaintiff, and, after setting forth just as minutely his superior qualifications, mechanical education, and great experience, which appear fully equal in all respects to those of expert Osborn, proceeds to take up in detail the patent claims, and shows to his entire satisfaction that all, with possibly one exception, are new, show inventive genius, and distinct advances upon the prior art. In the most lucid, and even fascinating, way he discusses all the parts of this machine, compares it with the others, draws distinctions, points out the merits of the one in controversy and the defects of all the others, considers the 20 odd patents referred to by Osborn, and in the politest, but neatest, manner imaginable shows that expert Osborn did not know what he was talking about, and sums the whole matter up by declaring this "invention of Mr. Schrader's, as embodied in the patent in suit, a radical and wide departure" from the Kahbel machine (admitted on all sides to be nearest prior approach to it), "a distinct and important advance in the art of engraving glassware, and generally a machine for this purpose which has involved the exercise of the inventive faculty in the highest degree."

Thus a more radical and irreconcilable disagreement between experts, touching the same thing, could hardly be found. So it is with the testimony. If we take that for the defendant, the Central Glass Company machine, and especially the Kuny Kahbel machine, built and operated years before this patent issued, and not patented, are just as good, just as effective and practical, as this one, and capable of turning out just as perfect work and as great a variety of it. On the other hand, if we take that produced by the plaintiff, we are driven to the conclusion that these prior machines, the product of the same mind, were only progressive steps forward from utter darkness, so to speak, into full inventive sunlight, which made clear to him the solution of the problem in this patented machine. The shortcomings of the earlier machines are minutely set forth, and the witnesses for the plaintiff are clear that they are neither practical nor profitable.

But this is not all of the trouble that confronts us in this case. Counsel of both sides, with an indomitable courage that must command admiration, a courage that has led them to a vast amount of study, investigation, and thought, that in fact has made them all experts, have dissected this record of 356 closely printed pages, applied all mechanical principles and laws to the facts as they see them, and,

besides, have ransacked the law books and cited an enormous number of cases, more or less in point, as illustrative of their respective contentions. The courts find nothing more difficult than to apply an abstract principle to all classes of cases that may arise. The facts in each case so frequently create an exception to the general rule that such rule must be honored rather in its breach than in its observance. Therefore, after a careful examination of these cases, it is no criticism of the courts to say that both sides have found abundant and about an equal amount of authority to sustain their respective contentions, and, as a result, counsel have submitted, in briefs, a sum total of 225 closely printed pages, in which they have clearly, yes, almost to a mathematical certainty, demonstrated on the one side that this Schrader machine is new and patentable, and on the other that it is old and not so. Under these circumstances, it would be unnecessary labor and a fruitless task for me to enter into any further technical discussion of the mechanical problems involved, for the purpose of seeking to convince either side of its error. In cases of such perplexity as this, generally some incidents appear that speak more unerringly than do the tongues of the witnesses, and to some of these I purpose to now refer.

First. I think it clear that prior to 1890 experiments had been made with etching machines by various glass companies, such as the Central Glass Company, George Dundan Sons, Hobbs, Brockunier & Co., and both the plaintiff and defendant companies; that all of these machines, up to the time Schrader built the one for the Central Glass Company in 1883, had only one arm on one side and a stationary arm on the opposite side; that this was true of the English machine, so often referred to, which Schrader saw and studied; that he had been experimenting with this problem of etching machinery, and while employed by the Central Glass Company in 1883 partially produced a three-arm machine, called the "Central Glass" or "Band 70" machine, which was finished by Kahbel and Blumenburg, because Schrader left the employ of this company before completing it; that in 1894 Kahbel constructed a four-arm machine after castings which Schrader furnished, which machine is the one known as the "Kuny Kahbel" machine.

Second. That when Schrader, who up to this time had been substantially the originator of this class of machines, went to Bryce Bros. in October, 1893, there had been a very limited commercial use made of etching machines, and all had been substantially failures. This, I think, can be gathered from the fact that few duplicates were made of the Central Glass machine and none of the Kuny Kahbel, except the one hereinafter mentioned.

Third. Schrader went to Bryce Bros. for the purpose of building etching machines—was employed for that purpose. He first built one after the Kuny Kahbel pattern. He did not construct any after the pattern of the Central Glass Company one. Why? Was it because the Kuny Kahbel one was an improvement over it?

Fourth. The Schiffbauers went to work for Bryce Bros. in April, 1894, under Schrader, coming from the coke ovens, without the

slightest prior knowledge of this kind of machines. They stayed there four years, and built, or assisted in building, a number of machines. They say the Kuny Kahbel machine was just as effective and just as complete as the other. They built no more after its pattern, however. Why? Was it because they knew Schrader's to be an improved machine?

Fifth. These Schiffbauers left Bryce Bros. and went direct to the Seneca Company. Before going the one brother went to the office to settle, the other to etching room to dismantle or put out of operation these machines. For what purpose did they go to the employ of the Seneca Company? To build etching machines, and they did build a number. They say the Kuny Kahbel machine was just as effective and complete as Schrader's. Did they build after its pattern? They knew—the Seneca Company knew—that a patent had been granted Schrader, and that no patent covered the Kuny Kahbel design. It would have been the natural thing for the Schiffbauers—for the Seneca Company—to have built the Kuny Kahbel machine. They certainly did not want legal complications and trouble for the mere pleasure of it. They did not, however, do this. They built a machine exactly after the model of Schrader's, substituting for the bevel gear the worm wheel, for the miter gear the spiral one, radial slots with bolts for the dovetail radial guides, shorter plate with adjustable stem for the oscillating plate to transmit motion to the eccentric. Why? Was it because the Schrader machine was practical and effective, while the Kuny Kahbel was not—because the Schrader machine was an improvement over the other? Why did the Seneca Company employ the Schiffbauers, rather than Kahbel, to build its machines?

Sixth. Gustav Schiffbauer says, in effect: "The Schrader machine is no improvement over the Kahbel one, and therefore not patentable." Yet on May 25, 1899, less than a year before his first testimony was given in this case, he had filed his application to secure a patent, and on March 13, 1900, two months and two days only before he so testified, had actually received a patent upon the machine he had been building for the Seneca Company, and which so clearly lacked novelty as to compel counsel for defendant to admit that he does not believe it to be valid. In his application to secure this patent, Schiffbauer was required to state, under oath, that it was his invention, was new, novel, and had not been in use for two years prior.

Its adoption of Schrader's machine entire, with immaterial mechanical changes, is so apparent that one is driven to the conclusion that the examiner in the Patent Office must have overlooked Schrader's prior patent, or else Schiffbauer's application would not have been seriously considered. Why was Schiffbauer so anxious to protect his work done in constructing these machines for defendant company? Was it because he knew Schrader's was the only practical and effective four-arm machine? It is a well-settled rule that a patent granted is prima facie evidence of the novelty of the thing patented. Teese v. Phelps, Fed. Cas. No. 13,819; Serrell

v. Collins, Fed. Cas. No. 12,672; Sands v. Wardwell, Fed. Cas. No. 12,306; Lehnbeuter v. Holthaus, 105 U. S. 94–96, 26 L. Ed. 939; Cantrell v. Wallick, 117 U. S. 689–695, 6 Sup. Ct. 970, 29 L. Ed. 1017.

In Judson v. Cope, Fed. Cas. No. 7,565, it is held:

"The superior working of the patented machine, as distinguished from all prior machines, may be evidence of a difference in principle, and is competent testimony upon the issue of novelty."

In Smith v. Goodyear Dental, etc., Co., 93 U. S. 486, 23 L. Ed. 952, Mr. Justice Strong says:

"We do not say the single fact that a device has gone into general use, and has displaced other devices which had previously been employed for analogous uses, establishes in all cases that the device involves a patentable invention. It may, however, always be considered; and, when the other facts in the case leave the question in doubt, it is sufficient to turn the scale."

In Palmer v. Johnston (C. C.) 34 Fed. 336, it is held:

"The fact that, as soon as a patented improvement was made and introduced, its advantages over devices which had preceded became manifest at once, and it commended itself to the public as a practicable and desirable improvement, affords a safer criterion of inventive novelty than any subsequent opinion of an expert or intuition of a judge."

See, also, Stanley Works v. Sargent, Fed. Cas. No. 13,289; Washburn, etc., Co. v. Haish (C. C.) 4 Fed. 900; Hill v. Biddle (C. C.) 27 Fed. 560.

In Cantrell v. Wallick, 117 U. S. 694, 6 Sup. Ct. 970, 29 L. Ed. 1017, Mr. Justice Woods says:

"Changes in the construction of an old machine, which increase its usefulness, are patentable. So a new combination of old devices, whereby the effectiveness of a machine is increased, may be the subject of a patent."

See, also, Loom Co. v. Higgins, 105 U. S. 580, 26 L. Ed. 1177; Barbed Wire Patent, 143 U. S. 275, 12 Sup. Ct. 443, 36 L. Ed. 154; Dubois v. Kirk, 158 U. S. 58, 15 Sup. Ct. 729, 39 L. Ed. 895.

In consideration of these authorities, under the conflicting state of the facts, I am constrained to hold that Schrader's patent must be upheld as a new and useful machine, and an advance upon the prior state of the art.

This brings us to the final question of whether or not public use was made of Schrader's machine more than two years prior to the filing of his application for the patent. If so, no matter how much novelty there may have been in the patent, it must, under the statute, be considered as having been abandoned to public use, and cannot be upheld for that reason; and this defense to this suit is very earnestly and vigorously asserted by the defendant. The courts have, in many cases, defined the meaning of "prior use." In Elizabeth v. Pavement Co., 97 U. S. 126, 24 L. Ed. 1000, Mr. Justice Bradley says:

"When the subject of invention is a machine, it may be tested and tried in a building, either with or without closed doors. In either case such use is not a public use, within the meaning of the statute, so long as the inventor is engaged in good faith in testing its operation. He may see cause to alter it and improve it, or not. His experiments will reveal the fact whether any, and what, alterations may be necessary. If durability is one of the qualities to be obtained, a long period, perhaps years, may be necessary to enable the inventor to discover whether his purpose is accomplished, and though, during"

all that period, he may not find that any changes are necessary, yet he may be justly said to be using his machine only by way of experimenting; and no one would say that such a use, pursued with a bona fide intent of testing the qualities of the machine, would be a public use, within the meaning of the statute. So long as he did not voluntarily allow others to make it and use it, and so long as it is not on sale for general use, he keeps the invention under his own control, and does not lose his title to a patent. It would not be necessary, in such a case, that the machine should be put up and used only in the inventor's own shop or premises. He may have it put up and used in the premises of another, and the use may inure to the benefit of the owner of the establishment. Still, if used under the surveillance of inventor, and for the purpose of enabling him to test the machine, and ascertain whether it will answer the purpose intended, and make such alterations and improvement as experience demonstrates to be necessary, it will still be a mere experimental use, and not a public use, within the meaning of the statute. Whilst the supposed machine is in such experimental use, the public may be incidentally deriving a benefit from it. If it be a gristmill, or a carding machine, customers from the surrounding country may enjoy the use of it by having their grain made into flour or their wool into rolls, and still it will not be a public use, within the meaning of the law. But if the inventor allows his machine to be used by other persons generally, either with or without compensation, or if it is with his consent put on sale for such use, then it will be in public use and on public sale, within the meaning of the law."

These principles strike me with great force as being sound and reasonable, and from them I am fully persuaded that a clear distinction must be drawn between the experimental use allowed of a machine sought to be patented, designed to produce articles, and that of a mere patented article itself, designed for general use or consumption. In the latter case, a presumption arises that, when the inventor issues to the public the article, he regards it as a finished product, and, in case he does not apply for patent within two years after, abandonment of his purpose to so do may well be assumed. In the case of a machine designed to manufacture articles, on the contrary, reason and common experience teach us that in most cases such machine will not come at once a perfect product from the first castings. Almost inexplicable defects will generally be found to mar the perfect operation. These defects must frequently be remedied, often by long study and much experimentation. The article itself may be produced by the machine in perfect state or nearly so, yet not quickly, effectively, and practically by reason of the defects in the machine. It seems to me that it would not be in accord with equity and sound sense to say that such produced articles must not be used, but needlessly destroyed in order to save the inventor from the charge of prior public use of the machine. Sale of the product of such machine may, in a secondary sense, be considered profit derived from the machine; but a fair construction of the principles of the law, it seems to me, should and does require that such profits should be derived in the primary sense from the sale of the machine itself before the inventor should be barred by this defense.

The case of Smith, etc., Manufacturing Co. v. Sprague, 123 U. S. 249, 8 Sup. Ct. 122, 31 L. Ed. 141, when considered in connection with the facts involved, is not in conflict with this case of Elizabeth v. Pavement Co. On the contrary, Mr. Justice Matthews cites approvingly a portion of the extract I have given from this

former case, but ascertains from the confession of the inventor himself that the buckle-lever machine involved "was not changed or altered, nor was any experiment with it or on it, during the period of some three years (prior to the two years before application for patent), while it made over 7,000,000 buckle-levers, which were sold"; that its use was for the purpose of conducting an established business; that it was the only one used for the manufacture of the article of which the patentee by a prior patent already had a monopoly; that he alone supplied the market with the article, and the whole demand was satisfactorily met by his machine. Under such circumstances it was very clear that the experimenting relied upon was simply incidental to its main purpose of trade and profit.

The case of Egbert v. Lippmann, 104 U. S. 333, 26 L. Ed. 755—the Corset-Spring Case—cited and relied upon, is one of a patent upon the manufactured article and not upon the machine. It therefore is not in point. The same distinction applies in Hall v. Macneale, 107 U. S. 90, 2 Sup. Ct. 73, 27 L. Ed. 367, involving an "improvement in locks"; in Miller v. Foree, 116 U. S. 22, 6 Sup. Ct. 204, 29 L. Ed. 552, involving a process in finishing and packing plug tobacco; and also in Manning v. Cape Ann Isinglass Glue Co., 108 U. S. 462, 2 Sup. Ct. 860, 27 L. Ed. 793, involving a process for the treatment of fish sounds in the manufacture of isinglass.

Briefly we desire to refer to another legal principle involved in this case. Counsel for defendant strenuously insist that the plaintiff must dispel the charge of prior use by proofs that shall be "full, unequivocal, and convincing"; while counsel for plaintiff just as strenuously insist that the defendant must sustain his defense of prior use by proof that shall remove all reasonable doubt. The former, in support of their contention, cite such cases as Smith & Griggs Mfg. Co. v. Sprague, supra; Swain v. Holyoke Machine Co., 111 Fed. 408, 49 C. C. A. 419; Clark Thread Co. v. Willimantic Linen Co., 140 U. S. 481, 11 Sup. Ct. 846, 35 L. Ed. 521; Morgan v. Daniels, 153 U. S. 120, 14 Sup. Ct. 772, 38 L. Ed. 657 (incorrectly cited as American v. Daniels); Brooks v. Sacks, 81 Fed. 403, 26 C. C. A. 456; and Thomson-Houston Electric Co. v. Lorain Steel Co., 117 Fed. 249, 54 C. C. A. 281. The latter cite, in support of the other doctrine, Young v. Wolfe (C. C.) 120 Fed. 956; Thayer v. Hart (C. C.) 20 Fed. 693; Mack v. Spencer (C. C.) 52 Fed. 819; Lalance Co. v. Habermann Co. (C. C.) 53 Fed. 375; Singer Mfg. Co. v. Schenck (C. C.) 68 Fed. 191; The Barbed Wire Patent, 143 U. S. 275, 12 Sup. Ct. 443, 36 L. Ed. 154. And they might well have cited in addition the cases of Campbell v. James, Fed. Cas. No. 2,361; Hawes v. Antisdel, Fed. Cas. No. 6,234; Magic Ruffle Co. v. Douglas, Fed. Cas. No. 8,948; Washburn, etc., Mfg. Co. v. Haish (C. C.) 4 Fed. 900. A number of other cases could be cited favoring both contentions in modified degrees. I will not now undertake to determine whether these cases are in conflict or not. They may, perhaps, be reconciled, to an extent, at least, upon the proposition that the burden is upon the defendant, asserting prior use, to prove it beyond reasonable doubt, but, when he has done so,

the burden is then upon the patentee to show, by proofs "full, unequivocal, and convincing," that such prior use was for the purpose of experimentation.

Be this as it may, if I analyze the evidence in this case rightly, applying the distinctions drawn between the manufacturing machine and the manufactured article, this defense of prior use must fall, because the evidence wholly fails to show prior public use of Schrader's machine more than two years before application for the patent. None of these machines were sold, and none were built or used, anywhere else than in the factory of his employer, the Bryce Bros. Company. A very considerable degree of secrecy was maintained, the etching room being kept under lock and key. The machines built after this design were finished but a few months prior to the two years, and it comes with overwhelming conviction that they must necessarily have been imperfect. Schrader had no work to do—was employed for no other purpose—than to experiment with and perfect these machines. The fact that they were used to etch glassware, and that this ware was sold, was both natural and permissible, for the reasons I have indicated. That these machines were taken back and forth from the etching room to the mold shop, for the purpose of remedying defects and making changes and improvement, I think is clear beyond question. The evidence to the contrary rests very largely upon that given by the Schiffbauers and their brother-in-law, Schmidt. These witnesses do not impress me favorably. They testify too readily and too much. Schmidt, if we are to believe him, was either so ignorant, or knew the language so badly, that he could not tell what a "drawing" or a "cog-wheel" was. Yet to every leading question propounded by defendant's counsel he could answer unerringly in favor of the defendant's pretension. The reason for doubting the evidence of the Schiffbauers has already been indicated.

Let the injunction issue and an accounting be directed.