**SOLO CUP COMPANY, Plaintiff,**

v.

**PAPER MACHINERY CORPORATION,
Ralph O. Martin, and John R. Baum-
gartner, Defendants.**

No. 58–C–138.

United States District Court
E. D. Wisconsin.

Jan. 14, 1965.

Robert C. Williams, Chicago, Ill., Elwin Andrus, Milwaukee, Wis., for plaintiff.

James E. Nilles, Suel O. Arnold, Milwaukee, Wis., for defendants.

TEHAN, Chief Judge.

This is an action in two counts (1) for patent infringement, and, (2) for unfair competition.

In Count 1 of the amended complaint, plaintiff seeks an accounting of the profits made by defendants as a result of the alleged infringement of Patent No. 2,321,-407, and damages. Since the patent in

suit has expired no injunctive relief is sought in this count. Jurisdiction of the cause of action arises under Title 35 U.S.C. § 281, and jurisdiction is conferred by Title 28 U.S.C. § 1338(a).

In Count 2 of the amended complaint, plaintiff also seeks an accounting and damages and an injunction restraining defendants from manufacturing or selling machines derived from drawings of plaintiff's conical paper cup forming machines. This cause of action arises under common law, and jurisdiction is conferred by Title 28 U.S.C. § 1332(a) in that the parties are citizens of different states and the matter in controversy exceeds the sum of $10,000 and also by § 1338(b) of Title 28 U.S.C.

## COUNT 1. MERTA PATENT NO. 2,321,407.

The patent in suit is Merta patent No. 2,321,407, issued to George M. Merta, June 8, 1943, on an application filed August 30, 1940, and plaintiff is owner of said patent by assignment.

The patent discloses a conical cup-making machine designed for automatically converting paper supplied in strip form into a conical paper cup having a glued joint.

The paper cups are formed on mandrels which are conical in shape and rotatable. After the paper enters the machine, and a knife has severed a blank of the correct size and shape to form a conical drinking cup and glue has been applied to one edge of the blank, the blank proceeds to the mandrel through suitable guidemeans which presents the blank to the mandrel at the first station. The mandrel is equipped with a gripper which grabs a portion of the blank to hold it on the mandrel. While a cup is being formed around the conical mandrel and is being rotated against pressing means to wind the blank thereon and press the glue joint, the mandrel is moved to a station on the machine where an additional operation is performed. At this station additional die members are brought around the cup on the mandrel, the bottom end of the cup is slightly blunted to

effectuate a seal and the top of the cup is rolled outwardly and downwardly into a bead. Following the blunting and beading of the rim of the cup the mandrel is moved to the final station where the cup is discharged from the mandrel into a stacking trough or tube. It then returns to the first station where it grips another blank and repeats the process.

The machine of the patent in suit was not a pioneer paper cup machine but follows other rotary paper cup machine patents of a similar type including Barbieri No. 2,049,417, issued August 4, 1936. As the introductory paragraph of the Merta patent states, the invention is related to "improvements in a cup-making machine and more particularly to machines for making sanitary conical cups from paper for use as drinking receptacles, ice cream cups, or the like, * * *."

The claims charged to be infringed by defendants' machines, the X–56 and V–59 relate to three groups of claims, directed to three different features of the cup making machine (1) the paper feed mechanism, (2) the gripper device for holding the paper on the mandrel, and, (3) the rimmer and blunter mechanism which rolls a bead on the top of the cup.

Defendants have denied infringement as to some of the claims and in addition assert as an affirmative defense, the invalidity of the patent by reason of (a) prior public use in the United States more than one year prior to the date of the application for the patent under § 102(b) of Title 35 U.S.C., and (b) invalidity of each of the claims charged to be infringed as anticipated by patents granted on applications filed in the United States before the invention by the patentee G. M. Merta under § 102 of Title 35 U.S.C. and lack of invention over prior art under § 103.

### PRIOR PUBLIC USE.

Defendants contend that the evidence adduced at the trial fully establishes that the Merta machine embodying the invention of the patent in suit was in public

use by the inventor, Merta, more than one year before the patent application was filed, hence the statutory bar of 35 U.S.C. § 102(b) invalidates the patent.

The defendants have the burden of proving such use by clear and convincing proof. Devex Corp. v. General Motors Corp. (C.A. 7) 321 F.2d 234.

The date of application for the patent in suit was August 30, 1940. Thus the critical date is August 30, 1939.

We find the following facts to be clearly and satisfactorily established by the evidence at the trial which includes the testimony of George Merta, the inventor, and George Zila, his associate.

On February 14, 1936, Merta's wife had applied for a patent for a novel heart-shaped paper blank for a cone cup which she had accidentally discovered while working with a paper heart on a Valentine box. Thereafter, Merta began work on a mechanism to make the blank and a mandrel for rolling the cone. In the latter part of 1936 or early 1937, Merta began work on his own cup-making machine at his home in Chicago during his spare time. He had gained experience with cup-making machines while working in Chicago at the Vortex Company, a paper cup manufacturing concern. Early in the year 1938, Merta started to operate his machine in a bedroom in his home. In the latter part of 1938, Merta obtained sample rolls of plain paper from various paper companies in Chicago, including Marathon, International and Smith Company, from which he made about 50,000 cups. By the end of 1938, the machine was operating to Merta's satisfaction, producing about 130 cups per minute. Merta's next step was the actual purchase of his first roll of paper for the sum of $6.00 from Smith Company in April of 1939. Before manufacturing cups from this paper, he made a design for the paper, selected the name Solo for the cups, after a suggestion from his wife that it would be a good name for a one-use disposable container, and had the design printed on the roll of paper by a printer in Chicago.

None of the cups made from the machine, either the plain or printed ones, were sold or distributed in the Chicago area. Instead, more than one-half of them were sent to a George Zila in Los Angeles, California. Zila, a fellow countryman [1] of Merta, had originally worked at Vortex Company with Merta, but had moved to California in 1936. As Merta and Zila testified, the two of them had an oral agreement to go into business together.

Admittedly, Merta maintained a policy of secrecy in the development of his machine and in its operation and permitted no outsider to see it throughout 1938 and 1939.

Meanwhile, Zila in Los Angeles, in his spare time, made the rounds of various wholesalers in the Los Angeles area and left samples of the cups with them. No prices were set for the cups, written orders taken, or records kept of the number of cups distributed. However, there is evidence that at least two companies— Drake Machine Company and Mechanical Development Company in Los Angeles, paid Zila for the cups he left with them. The record establishes that approximately 50,000 cups were distributed and the sums of money received were less than One Hundred Dollars. However, the activities of Zila in introducing the cups in the Los Angeles market was sufficient to come to the attention of the major cup machine manufacturers in Chicago.

In June of 1939, which is prior to the critical date, the West Coast representative of Dixie Cup had notified his Chicago office that the new type of cup was appearing on the Los Angeles market, and Mr. Hulseman of the plaintiff corporation (then Paper Container Corporation) had heard that "he [Merta] had a cup making machine on the west coast * * *". Mr. Hulseman went to see Merta in Chicago to inquire about the machine sometime prior to July 3, 1939.

---

[1]. Both Merta and Zila had immigrated to the United States from Czechoslovakia as young men.

In early July, 1939, and before the Fourth, Merta had the machine crated and shipped to Los Angeles and he and his family moved to that city. Merta took with him the remainder of the cups which had been produced by the machine and upon settling in Los Angeles, obtained a job at Mechanical Development Company with Zila. In furtherance of their business plans, Merta started to make dies for a proposed paper cup dispenser to be sold with the paper cups while Zila continued to make the rounds of the wholesalers to introduce the cups.

The machine itself was not set up in California or cups made therefrom until October of 1939, after the critical date. On February 23, 1940, Merta applied for a patent (No. 2,272,920) on a Method of Forming Reinforcing Beads on Conical Paper Cups, which included improvements in bead forming disclosed in an application, No. 233,890, filed October 7, 1938, and formally abandoned.

In March of 1940 Merta sold his machine to plaintiff's predecessor. Thereafter, the attorney for plaintiff's predecessor prepared the application for the patent in suit which was signed by Merta and filed on August 30, 1940.

█ Since the decision of Judge Learned Hand in Metallizing Engineering Co., Inc. v. Kenyon Bearing & Auto Parts Co., Inc., et al., 2 Cir., 153 F.2d 516, it is well settled that the commercial exploitation of a secret process or a machine maintained in secrecy, by the sale of its product constitutes a public use under § 102(b). In a well-reasoned opinion, Judge Hand wrote that

" * * * it is a condition upon an inventor's right to a patent that he shall not exploit his discovery competitively after it is ready for patenting; he must content himself with either secrecy, or legal monopoly. It is true that for the limited period of two years he was allowed to do so, possibly in order to give him time to prepare an application; and even that has been recently cut down by half. But if he goes beyond that period of probation, he forfeits his right regardless of how little the public may have learned about the invention; * * *." (Page 520)

█ Plaintiff, however, seeks to avoid the application of this principle by invoking the equally well-established rule that where the prior use is primarily for experimental purposes and not for commercial exploitation, the prior use, more than one year before patent application, does not invalidate the patent. Westinghouse Electric & Mfg. Co. v. Saranac Lake Electric Light Co., 2 Cir., 113 F. 884; Bryce Bros. Co. v. Seneca Glass Co., C.C., 140 F. 161.

█ Thus the issue to be resolved is narrowed to whether the use of the Merta machine to produce cups in Chicago prior to the critical date was primarily for the purpose of experiment or for commercial exploitation. We have carefully reread the testimony and studied the pertinent exhibits and have come to the conclusion that the use was primarily for commercial exploitation and not experiment.

The blank for the paper cup had been developed and a patent applied for by Merta's wife as early as February of 1936. A machine had been built by October of 1938, and in October of 1938, Merta had applied for patent protection on the bead forming feature (although the application was subsequently abandoned).

The machine itself was running efficiently as early as the end of 1938 and the inventor, Merta, expressed complete satisfaction with its rate of production and its operation. The machine was crated for transportation to California around the First of July, 1939, and the evidence shows that it was not used again until October, 1939. We think it unreasonable to believe that an industrious hardworking individual such as Merta would not have tinkered and experimented with the machine if he were dissatisfied with his invention and the rate of production. Then, too, the fact that prior to the critical date Merta had spent considerable time deliberating on and choos-

ing an appropriate name and design for his product, incurred the expense of having the name Solo and the design imprinted on the paper and begun the development of dies for a cup dispenser convinces us that the use of the machine to produce cups was for commercial purposes. The reason for the secrecy policy of Merta, as given by Merta, was his belief that if he took any actual orders or kept records of the transactions he would be sued. The determining factor is the motivation and purpose of the inventor in producing the cups and distributing them in the Los Angeles area.

We do not propose to review the many cases in which the courts have held a prior use to be experimental rather than commercial since each case must be decided on its own set of facts. In general, a reading of the cases discloses that although mere reduction to practice is not the test, the use ceases to be experimental when the motivation of the inventor is to exploit the invention and gain a competitive advantage over others. See for example, Hautau v. Kearney & Trecker Corp. (D.C.1961) 191 F.Supp. 430; Watson Comr. Pats. v. Allen, 103 U.S.App.D. C. 5, 254 F.2d 342, and Atlas v. Eastern Air Lines, Inc. (1 Cir. 1962) 311 F.2d 156.

There is no evidence in the record that after Merta had bought his first roll of paper, settled on the name Solo and a design for the paper in April of 1939, that the use of the machine to make cups was for testing or experimental purposes. The product of the invention is a simple, disposable paper cup. No extended testing of the cups was necessary to ascertain whether they would serve the purpose for which they were intended. Nor is there any testimony that the Merta machine itself required long-continued operation to detect any defects. On the contrary, the evidence shows that the machine had been perfected long before the critical date, August 30, 1939, and Merta's purpose in producing the cups was to exploit his invention commercially by developing a market for the cups in California.

For the foregoing reasons we hold that the patent, No. 2,321,407, is invalid by reason of prior public use of the invention in this country more than one year prior to the patent application. 35 U.S. C. § 102(b).

## INVALIDITY FOR LACK OF INVENTION—GROUP I CLAIMS—THE "FEEDING" MECHANISM.

This group of claims is comprised of Claims 1, 2, 3, 4, 5 and 22, of which Claim 3 is typical. They were allowed by the Patent Examiner by his first official action without change. Claim 3 reads:

"3. In a cup-making machine having a plurality of rotatable mandrels mounted for intermittent translatory movement with blank gripping means associated with each of said mandrels, a feeding means arranged to feed successive blanks to said mandrels at a point in the translatory path of said mandrels, said feeding means *including a blank supporting guide member* * *over which a blank may be fed to a mandrel gripping means* and seized by said gripping means during a pause in the translatory movement, *said guide member being mounted for movement* into and away from blank supporting position, and means for moving said guide member away from blank supporting position during translatory movement of said mandrels." (Emphasis added)

* Both parties refer to this element as a "flapper plate".

Defendants assert that the claims of Group I read directly on Barbieri Patent No. 2,049,417 (hereinafter referred to as Barbieri '417) and Barbieri Patent No. 1,953,917 (not cited by the Patent Office) and are invalid. In our view, Barbieri '417 is the more pertinent reference and the only one which we need discuss.

Barbieri '417, like the patent in suit, relates to a machine for making a conical cup. It has a turret with mandrels mounted thereon. The blanks are fed to the mandrel by a feeding device and as the blank is thus fed, it passes be-

tween two guide plates—the upper one is a movable plate which comes down on the blank as it is fed into the gripping device on the cone or mandrel. As the cone or mandrel moves away, the upper plate moves away. The lower plate remains fixed. Thus, the only difference between Claim 3 of the patent in suit and the feeding mechanism of Barbieri '417 is that in Barbieri, the upper plate rather than the lower swings away and it is the lower fixed plate which supports the blank as it is fed into the gripping means on the mandrel. Mr. Merta, the inventor of the machine embodied in the patent in suit was called as a witness by the defendants. He was thoroughly familiar with the machine built pursuant to the teaching of the Barbieri '417 patent since he had worked on the machine at Vortex Corporation, the owner of the Barbieri '417 patent. It is his testimony that the turret of the Barbieri machine rotates in a different direction from the Merta machine. Therefore in order to free the blank, it was necessary that the upper plate swing away. In the Merta machine the turret rotates in a clockwise direction and thus it is the lower plate "flapper" that swings away in order to get out of the way of the blank. No new result is obtained by the Merta structure as compared to the Barbieri patent, nor does the structure serve a different purpose or function. Since Barbieri '417 is a Patent Office reference, plaintiff relies on the presumption of validity in asserting that this group of claims is not anticipated and meets the standard of invention. The presumption, of course, is a rebuttable one. It is our opinion that in the case at bar it has been overcome by the testimony of Merta, the inventor, and defendants' expert, Bodendoerfer.

Plaintiff takes issue with defendants' attempt to equate the upper "flapper" plate of the Barbieri patent with the lower "blank supporting guide member" of the claims in suit. Plaintiff asserts that the upper plate or hold down arm cannot be said to support the paper since support means to "bear the weight of."

It is our opinion that this semantic dispute is of little real consequence. Granting that in Barbieri it is the lower plate and not the upper which supports the blank, in both Merta and Barbieri, a blank is fed between and supported and guided by two members and when the blank has been gripped by the mandrel, one of these members swings away to free the blank. It is the direction of rotation of the turret which determines which of the plates will swing away after the blank is "fed" to the mandrel.

■ Since the feeding mechanism of the patent in suit as claimed in Claims 1 to 5 and 22 is structurally almost the same as that of Barbieri, performs the same function and accomplishes the same result, it is the court's opinion that these claims, if not technically anticipated, are invalid for lack of invention under 35 U.S.C. § 103.

Defendant corporation has admitted that its X–56 machine infringes the Group I claims, if valid, and its V–59 machines are not charged to infringe.

GROUP II CLAIMS—THE GRIPPER MECHANISM.

■ The Group II claims, 6, 7 and 24, of which Claim 7 is representative are addressed to the gripper member in the mandrel. They were allowed by the Examiner as originally filed. The prior art patent, principally relied on by defendants as anticipatory is Van Sant, No. 1,434,934, a Patent Office reference.

Claim 7 reads:

"7. In a conical cup-making machine, a rotatable cup-forming mandrel and a blank gripping and releasing means, said means including a gripper member mounted in the apex of said mandrel and conforming to the peripheral configuration of the same when in operative gripping position, said gripper member being movable to a position without the peripheral configuration of said mandrel to discharge a cup therefrom, and a gripper operating mechanism attached to said gripper member and extending through said mandrel to

move said gripper member into operative and discharge positions at predetermined times."

In the operation of the Merta machine the gripper mounted in and forming a part of the apex of the mandrel is opened and the blank is shoved into the gripper and the gripper is snapped shut. After the cup is formed and the mandrel reaches the discharge station, the gripper is opened and it pushes the cup off the mandrel.

Prior art machines had used gripper members at various places along the mandrel. For instance, Barbieri '417 had located the gripper member in the lower part of the mandrel rather than at the apex and the method for discharging the cup was provided separately. Barbieri employed a charge of compressed air in the mandrel chamber to strike against the interior of the cup to blow the cup from the mandrel.

Van Sant, issued November 7, 1922, relates to a paper cone wrapping machine which is hand operated by means of a crank. It has a cone-shaped mandrel with a groove on the surface which runs from the apex to the base of the cone. The apex portion of the cone is cut off completely from a frusto-conical portion and attached to a rod through the longitudinal center of the cone. The blank is brought into the groove and as the mandrel is turned the paper is wound around in the same manner as the film in the end of a film spindle in a movie projector. After the cone is completed the push rod which goes through the axis pushes the apex portion away from the cone body. This action releases the blank from the cone. Fishleigh, plaintiff's expert, testified, and we so find, that the Van Sant groove or slot is not a blank gripping mechanism nor its equivalent. The conical portion which moves out does not serve to release a positive gripper but acts purely as an ejector. The rod extending through the center of the cone operates the ejector mechanism and does not affect whatever action there may be in the slot or groove. It is our opinion that the Group II claims are therefore not anticipated by Van Sant.

As subsidiary art, defendants rely on Dunlap, No. 1,689,427 (not cited by the Examiner). An analysis of that structure, however, discloses that it is not as pertinent as Van Sant. The slot in Dunlap also does not operate as a positive gripper and in addition, when inoperative, the slot moves to a position within the body of the mandrel rather than outside the body of the mandrel, as called for by the Group II claims of the patent in suit. We therefore hold that the Group II claims are not anticipated by the prior art patents of record in the case at bar.

There remains the question of whether the difference between the subject matter of the Group II claims and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which the subject matter pertains. 35 U.S.C. § 103. In view of the prior art which discloses a gripper means in the mandrel and the Van Sant patent which teaches the ejecting of the cups by means of making the mandrel in two parts and moving the apex section of the mandrel away from the remaining frusto-conical body, defendants argue that it would have been obvious to a mechanic skilled in the art to combine these two elements and design the structure claimed in the patent in suit. However, in light of the fact that the concept of the double function of both gripping and ejecting is not disclosed in the pertinent prior art relied upon and cited by the Patent Office, the presumption of validity prescribed by 35 U.S.C. § 282 requires a finding of validity. See La Maur, Inc. v. L. S. Donaldson Company, D.C., 190 F.Supp. 771, 8 Cir., 299 F.2d 412; University of Illinois Foundation v. Block Drug Co., D. C., 133 F.Supp. 580; 7 Cir., 241 F.2d 6; Copease Mfg. Co. Inc. v. American Photocopy Equipment Co., 7 Cir., 298 F.2d 772. We find Claims 6, 7 and 24 inventive over the prior art.

INFRINGEMENT OF GROUP II CLAIMS.

Defendants admit infringement of the Group II claims by their X–56 machine but deny that the V–59 machine infringes. In the V–59 machine the gripper member in the mandrel lies in a plane a fraction of an inch away from the axis of the cone so that it does not pass *through* the point of the cone. In all other respects the gripper responds to the limitations of the Group II claims. Defendants contend that this location of the gripper member avoids infringement because the claims call for the gripper member to be located "within the apex of said mandrel" and the apex must be considered to be the precise point of the cone. Defendants further claim that the file wrapper history supports their position since one of the original claims (Claim 13) which called for the gripping means to be "adjacent to the apex" was rejected, the Examiner stating that "The proximity of the gripping means to the apex is only a matter of degree and involves no invention." As a result of this action, Claim 13 was cancelled. However, Claim 13 lacked other elements making for invention and there is nothing in the file wrapper to show that the plaintiff thereafter limited its claim to a location in the exact apex of the cone in order to obtain its allowance by the Examiner. The claims of Group II were allowed on the first official action of the Patent Office in their original form and no file wrapper estoppel can be predicated thereon. On the contrary, the specification of the patent as well as the file wrapper history discloses that "the apex of the cone" as used by the patentee referred to the *apex portion* rather than the exact apex of the conical mandrel. Accordingly, we find that the gripper member of the V–59 machine is mounted in the apex of the mandrel as such term is used in the patent, and defendants' V–59 machine infringes.

GROUP III—BLUNTING AND BEADING OPERATION.

Group III consists of only one claim, Claim 33, which defines the combination for forming the bead on the rim of the cup and blunting the conical bottom tip.

Claim 33 reads:

"33. In a conical cup-making machine having means for winding a blank into cup form on a conical mandrel, the combination of a die mechanism for assisting in the formation of a bead on the rim of said cup while setting the bottom thereof including a reciprocating die carriage having a frusto-conical portion and a cooperating conical bottom setting portion slidably mounted with respect thereto."

The patents principally relied on by defendants to negative invention are Barbieri No. 2,197,782, and Harvey No. 2,215,698 neither of which is a Patent Office reference.

Barbieri '782 discloses a conical cup-making machine in which a rim-forming operation and a blunting operation on the bottom of the cup are performed at the same station and contemporaneously.

In Barbieri, the mechanism for forming the drinking rim is slidably carried on each mandrel and at the appropriate station moves toward the cup, forms the rim and moves away. The rim, thus formed, is not a bead as in the patent in suit, but is in the nature of a flare or outwardly disposed lip. While the rim-forming operation is taking place, the blunting mechanism is in contact with the apex of the cone. The blunter includes a frusto-conical portion which surrounds the lower portion of the paper cone on the mandrel and a blunting pin whose end is a semi-spherical shape. This pin is reciprocated forward against the end of the paper cup and then back to effect the blunting and setting of the bottom of the cup. Both the rim-forming and the blunting are formed contemporaneously, although the rim-forming mechanism is in operative position for a longer time than the blunting mechanism.

Although the patent above described was not cited by the Examiner, a prior Barbieri patent, No. 2,104,535, which is

practically the exact disclosure, was a Patent Office reference. If anything, it is even more pertinent since the structure for forming the flare is defined more precisely. Hence the presumption of validity is not weakened by failure to cite Barbieri No. 2,197,782.

The Harvey patent, also not cited by the Patent Office, is pertinent because it discloses a structure for forming a bead on a flat bottom souffle cup. The bead on the Harvey cup is formed in exactly the same manner as that of the Merta machine, there being formed first a cylindrical portion on the upper end of the cup and then complementary dies are rolled down over the cylindrical portion to form a bead at substantially the same time that the flat bottom is set or impressed with a plunger. The action of the plunger in setting the bottom of the cup is unrelated to the bead formation.

Thus Harvey discloses that the method and structure for beading a rim on a paper cup is old in the art. It is true that the disclosure relates to the beading on a flat bottom souffle cup and there is no teaching in the prior art of the rolling of a bead on a conical cup. However, the combination of forming a rim on a conical cup and blunting at the same station is old in the art and Claim 33 does not define the structure for the formation of the bead.

In the patent in suit, both the blunting and beading operation take place at the same station. The blunting, however, is done first and independently of the rimming and is accomplished by imparting a "hammer" blow to the slidable conical bottom portion of the die. After the blunting has occurred, the cup is held by the frustro-conical portion of the die and a reciprocating die on the mandrel moves down to perform the beading operation. The conical bottom setting portion performs no function in relation to the formation of the bead.

Defendants assert that since there is no cooperative effect producing a new result between the beading end of the die mechanism and the blunting end of the die carriage, Claim 33 is an unpatentable aggregation of old elements. General Motors Corp. v. Estate Stove Co., 6 Cir., 201 F.2d 645.

After thorough consideration of the claim 33, we are of the opinion that the elements of the die mechanism which do the blunting and the elements which form the bead do not interact to perform any additional or different function and hence the combination is unpatentable.

INFRINGEMENT.

Claim 33 contains the limitation that the die mechanism include a reciprocating die carriage "having a frusto-conical portion and a cooperating *conical bottom setting portion slidably mounted*" (emphasis added) with respect to said frusto-conical portion. In both the X–56 and the V–59 machine, the bottom setting portion is not conical but semi-spherical and it is not slidable with respect to the frusto-conical portion. This semi-spherical bottom setting portion or blunting pin is a fixed member and travels with and is an integral part of the die carriage. The blunting is accomplished by a pressing action as the blunter pin moves against the bottom of the cone on the mandrel. Thus, since the defendants' X–56 and V–59 machines do not respond to the limitations of Claim 33, they do not infringe Claim 33, if valid.

COUNT 2. — UNFAIR COMPETITION.

In this cause of action, plaintiff seeks damages and a permanent injunction restraining defendants from manufacturing or selling machines derived from drawings of plaintiff's conical cup-forming machines. In essence, plaintiff charges that in the design and manufacture of its conical cup-forming machines, defendants used trade secrets in the form of copies of production drawings of plaintiff's 101 machine which defendants obtained wrongfully and in violation of the property rights of plaintiff.

In 1940, plaintiff acquired the prototype conical cup machine from the inventor, Merta, as well as rights to the invention therein. Beginning around

1945, plaintiff began the development of an improved rolled rim conical cup machine designated the "101".

Besides Solo Cup Company and the corporate defendant, there are only four or five other manufacturers of rolled rim conical machines in the United States, and all of them except the defendant corporation, manufacture the machines for their use only and do not offer their machines for sale. Plaintiff has always maintained a strict policy of secrecy in relation to its cup-making machine which it has enforced. Only authorized personnel have been permitted to examine its machines or drawings and great care has been taken that blueprints sent to suppliers of any of the component parts of the machine were sent only to responsible companies which could be trusted to respect their confidentiality. Employees of Solo Cup Company were advised of this policy both orally and by posted bulletins. All supervisory employees, officers of the company, and the entire engineering department were required to sign an employment contract imposing the obligation of confidentiality and non-disclosure of "all processes, drawings, data, reports, maps, sales plans, price data, customer lists * * *". Plaintiff has continued to improve and modify this machine and has expended approximately one million dollars in its development and improvement.

In 1947, Milwaukee Shipbuilding Corporation, Paper Machinery Corporation's predecessor, was formed by the individual defendants, Ralph A. Martin, and John Baumgartner, Sr., as a "skeleton" organization rather than an active corporation. It was intended to be a vehicle for any opportunities arising for repairing ships and vessels in the event of another war. Martin was Vice-President, and Baumgartner, President. A companion corporation, Mercury Engineering Corporation, of which both Martin and Baumgartner were officers and principal stockholders, was in the business of building specialty paper converting machines such as flat-bottom souffle paper cup machines, lace paper machines and die cutters. Martin's responsibility in both of these predecessor companies was in the area of sales, administration, and fiscal matters. He is not an engineer. Baumgartner, active head of Mercury Engineering, and an accomplished machine designer, was knowledgeable in the technical phase of the business.

Sometime early in 1958, it came to the attention of officers of the plaintiff corporation that defendants were offering for sale a rolled rim cone cup machine. On March 30, 1958, Mr. Rassau, then chief engineer and Vice-President of plaintiff, came to Milwaukee and there examined one of defendants' X–56 machines. After contacting Martin, and receiving permission to examine the drawings of the defendants' machines, Rassau came to Milwaukee, examined the drawings and the machine and reported to his company similarities between the accused machine and drawings of plaintiff's "101" machine.

A series of schedules of drawings were prepared by plaintiff to show the similarities between its "101" machine and defendants' X–56 machines, and have been admitted into evidence as Exhibits 140 through 149.

The parties have stipulated:

"(1) Certain of the drawings of Schedules A through K show plaintiff's parts and defendant's parts which would be identical.

"(2) Certain of the drawings of Schedules A through K show plaintiff's parts and defendant's parts which would be substantially identical.

"(3) Certain of the drawings of Schedules A through K show that copies of comparable drawings must have been used in the preparation of the plaintiff's drawings.

"(4) The drawings referred to in Paragraphs 1–3 constitute 80%–90% of the drawings listed in Schedules A through K and contained in Exhibits 140 through 149 inclusive."

It was also stipulated that Schedules A through K consisted of 128 Solo drawings and 128 Paper Machinery Corporation's drawings.

Thus there is no issue as to whether or not Solo Cup drawings or copies thereof were used by the defendants. They were.

The ultimate question that this court must determine is whether the use of the Solo Cup production drawings or copies thereof in the manufacture of their X-56 machine was wrongful and thus an act of unfair competition. The resolution of this question depends on whether the defendants obtained possession of the Solo Cup drawings or copies thereof under circumstances imposing an obligation that they not be used in the manufacture of their competing machines.

The general principle governing liability for disclosure or use of another's trade secret is set forth in Restatement of Torts, § 757:

"§ 757. LIABILITY FOR DIS-
CLOSURE OR USE
OF ANOTHER'S TRADE
SECRET — GENERAL
PRINCIPLE.

"One who discloses or uses another's trade secret, without a privilege to do so, is liable to the other if

"(a) he discovered the secret by improper means, or

"(b) his disclosure or use constitutes a breach of confidence reposed in him by the other in disclosing the secret to him, or

"(c) he learned the secret from a third person with notice of the facts that it was a secret and that the third person discovered it by improper means or that the third person's disclosure of it was otherwise a breach of his duty to the other, or

"(d) he learned the secret with notice of the facts that it was a secret and that its disclosure was made to him by mistake."

The actual theft of plaintiff's production drawings by defendants,

would, patently, be an improper means. Similarly, the acquisition of copies of Solo Cup drawings from a third party, knowing that Solo Cup had maintained its production drawings as trade secrets and knowing, either that such third person had actually stolen the drawings or that he breached a duty in transferring them, would subject the defendants to liability. See Colgate-Palmolive Co. v. Carter Products, Inc., 4 Cir., 230 F.2d 855; A. O. Smith Corp. v. Petroleum Iron Works, Inc., 6 Cir., 73 F.2d 531.

We turn then to a recital of the facts which have been established by the testimony adduced at trial and the exhibits introduced in evidence.

Sometime in 1947, defendants manufactured its first conical paper cup machine designated the X-21, having no rolled rim. Only one machine was manufactured. It was designed by Mercury Engineering for Gold Metal Products Co. and produced a long conical paper cup of the type used in connection with the sale of "spun sugar" or cotton candy. Thereafter, in 1947 or 1948, defendants had inquiries for various types of cup machines and defendants considered designing a conical cup machine to be designated the X-22. It was contemplated that the X-22 would make a conical drinking cup with a rolled rim. Although specifications were laid out for the proposed X-22, and it was advertised in defendants' brochure, no machine was ever built or sold.

Sometime between 1947 and 1948, one Harry A. Hooker, a former employee of plaintiff had developed a conical paper cup machine. Hooker, who had been a salesman for a year or two for plaintiff, told defendants that in developing his machine he had some Solo people "twilighting" for him on the design of his machine, including one Sandmann of Sandmann Engineering, a former Solo employee. Sandmann, in turn, had hired G. R. Z. Engineering of Chicago to help make the drawing for the Hooker machine. William Sims of G. R. Z. Engineering Company had also been an employee of Solo's predecessor. Hooker

approached defendants with various propositions in relation to his machine. Initially, he was interested in obtaining a position as a saleman for Mercury and subsequently proposed to Mercury that Mercury build a machine for him. Since Mercury's policy was not to build equipment for anyone else unless Mercury itself designed it, this proposal was turned down. Hooker then attempted to sell a set of blueprints for his cup machine to defendants. Sale of the drawings was eventually accomplished but the evidence is conflicting as to the circumstances surrounding the sale of the set of Hooker drawings and the exact date of the physical transfer by Hooker of the drawings to defendants is not established. The only document which supports the fact of purchase is a check dated March 21, 1949, made out in favor of Harry A. Hooker on the account of defendants and cashed in the Morrison Hotel in Chicago. The original Hooker drawings have not been found. A set of reversals wherein the drawings appear in reverse on the back of a sheet of paper and the title block appears normally on the face of the sheet of paper as well as blueprints made therefrom are in evidence. Although many of the defendants' employees testified as to knowledge that the Hooker drawings had been acquired by defendants in 1949, including John Baumgartner and Don Loeser, then a design engineer for defendant corporation, only Ralph Martin testified as to the circumstances under which the purchase and transfer were allegedly made. He testified that the price originally set by Hooker was $4000.00 with continuing royalties, and that at that price, defendants were not interested. He gave the following account of the consummation of the sale:

"* * * one day we [we] had a rush telephone call from Mrs. Hooker in Chicago. Her husband was seriously ill, and I went down to Chicago—no, I'm sorry. She said, would we give her $400 for a set of prints? This is from $4000. And I finally said, 'We are not interested.'

She said, 'If you bring me a check for $250, you can have the set of prints,' so Mr. Baumgartner and I discussed the thing rather hurriedly and felt, what could we lose for $250? and I went down there, and he was in bed in the hospital and his wife greeted me when I went in. I don't remember the name of the hospital. It was Henrotin or St. Luke's, but it was on La Salle Street.

\* \* \* \* \* \*

"* * * and she greeted me at the door and he was in bed. I gave them the check, they gave me the bundle of prints—a big bundle. I think it was three sets. And away I went, and that was it." (Tr. Pages 148–149)

Martin further testified that

"* * * Mr. Hooker recovered and he arranged for us to see the machine at a machine shop in Chicago." (Tr. Page 150)

Yet, in response to the very next question of counsel

"Q. You had purchased the prints before you saw the machine shop in Chicago—the machine in the machine shop in Chicago?

Martin said

"A. I'm not too clear on that; whether we had already had the prints or whether we saw the machine. I'm not clear on that." (Tr. Page 150)

Martin's testimony, in addition to being vague and implausible, is also sharply contradicted by the testimony of Mrs. Hooker, whose deposition was in evidence, that she made no calls while in Chicago while her husband was ill and that she never saw any blueprints.

In the latter part of 1949 and 1950, Ralph Martin initiated two attempts—through Sandmann Engineering Company and G. R. Z. (already heretofore referred to as staffed in part with ex-Solo Company employees) to have a conical rolled rim cup machine similar to

plaintiff's designed for defendants. Both attempts were not followed through.

Ralph Martin, from 1950–1955, made numerous attempts to hire an engineer who could design a cone cup-making machine similar to Solo Cups but in spite of such efforts—no engineer was hired.

### EMPLOYMENT OF RUSSELL ANDERSON.

Russell Anderson, in 1955, was acting engineer for plaintiff and had been since 1953. He had been hired on April 11, 1947 at which time he signed a standard Solo employment agreement which included the provisions against disclosure of confidential information previously referred to. During his employment with plaintiff, Anderson worked in the engineering department of plaintiff and participated in the design and improvement of plaintiff's conical cup machines including the "101" conical cup-forming machine. Effective February 1, 1955, Anderson's salary was raised by plaintiff from $10,800 to $12,500 per year.

Prior to the summer of 1955, both John Baumgartner and Ralph Martin had met Russell Anderson, both knew of his responsible position with the plaintiff, and that he had access to the machines and drawings which were the subject of plaintiff's secrecy policy of which both Martin and Baumgartner were aware. Martin was the person who handled the negotiation of the employment of Anderson. It is also established that as between the two officials, Martin and Baumgartner, Martin was the prime mover not only in obtaining the services of Russell Anderson but in the entire conical cup machine project. Baumgartner, though less than enthusiastic about either the rolled rim conical cup machine project or the hiring of Russell Anderson, whom he did not like personally and in whom he had some "lack of confidence", did agree to the hiring of Mr. Anderson. At the time of hiring Anderson, Baumgartner says he did not even interview Anderson, and after only a five minute or so conversation with Martin, approved Anderson's employment at an annual salary of $18,000, which, incidentally, with the exception of Martin and Baumgartner, was higher than any other person in the employ of Milwaukee Shipbuilding. Anderson, who, according to Martin, had become dissatisfied with his position at Solo Cup agreed to work for the defendant corporation, and in spite of an offered increase in salary to $16,000 by plaintiff, went to work for defendant corporation on October 1, 1955 at the salary of $18,000 per year.

Although defendants had not yet even begun designing a rolled rim paper cup machine and although they had been possessed of the Hooker drawings for a period of about six years during which they had received numerous inquiries concerning such a machine from potential customers, nevertheless, in September of 1955, Martin negotiated a firm sale of the X–56 machine to Hudson Pulp & Paper Company at a total price of $129,000. Defendants bound themselves to delivery of the machines within seven to eight months from the date of the purchase order.

Neither Anderson nor the defendants informed Solo Cup of his new employment. Instead in order to conceal the fact of his employment from plaintiff, Martin, with at least the tacit consent of Baumgartner, made arrangements to have Anderson put on the payroll of Zinnpac, Inc. of Chicago. Anderson, despite the fact that he was in Chicago for a period of two or three months, never was in the Zinnpac plant in Chicago and never did any work for Zinnpac. Furthermore, although well aware that his new employment involved paper cup machines, he misled plaintiff by stating that he was going into an entirely new line of endeavor. Martin's explanation of the motivation for this deception was the desire not to alienate Mr. Hulseman, who was a potential customer of defendants.

We cannot accept this as an explanation. Except for Martin's unsupported statement, the only business transactions between plaintiff and defendants had taken place about ten years earlier and

any expectation of prospective sales would appear highly speculative, at best. Although Mr. Baumgartner attempted to corroborate Martin's version in this regard, his testimony was also evasive and contradictory. It was obviously based on Martin's representations and as his characterization of these arrangements as "goings on" reveals, his testimony was given with complete lack of conviction. We find that the reason for the calculated deception was to prevent plaintiff from discovering that defendants were secretly embarked on a "crash" project to make a machine identical to plaintiff's "101" in order to consummate the sale to Hudson Pulp & Paper Company.

Immediately after his hiring, Anderson went to Europe with Martin for three weeks to inspect machinery. Upon his return, Martin said that he gave Anderson the "Hooker" drawings and he began work on the design of the cone cup machine in his home in Chicago until January of 1956, while ostensibly employed by Zinnpac Company. Anderson moved then to Milwaukee and was assigned a drawing board in the Engineering Department at Mercury Engineering Company. There he worked until about June, 1956, when he moved to the Milwaukee Shipbuilding plant.

In spite of the knowledge by both Martin and Baumgartner of the sensitive and confidential position Anderson had held with the plaintiff company, we find that Anderson was not warned by defendants not to use any property belonging to Solo Cup in his design of the cup-making machine. Martin's testimony that he and Baumgartner conferred with Anderson and warned him not to use property belonging to Solo, was flatly contradicted by Baumgartner.

By June of 1956, the X–56 machine was in its final detailing stages and soon thereafter delivery of the first machine was made to Hudson Pulp & Paper Company. During the design period, Russell Anderson was placed in complete charge of the entire project. Baumgartner was busy with the affairs of the Mercury Engineering Company and it is very evident from his testimony that he purposely remained aloof from the project. In fact, Baumgartner gives a classic account of aloofness between an executive officer of a company and its highest paid engineer. His testimony is that during the five months from January to June of 1956, when the X–56 was completed, on only one occasion, and that by the most casual happenstance, did he have any contact with Anderson. He paused by the drawing board and expressed his disapproval of the type of movement Anderson was using to drive the main turret. Anderson resented his suggestion and did not follow it. That, according to Baumgartner, was the extent of the relationship.

According to Martin, he was busy in the sales end of Milwaukee Shipbuilding, and paid no attention either to the development of the X–56 machine. Defendants concede that Anderson was in complete charge of the X–56 project and the drawings were merely copied by the draftsmen, many of whom were part-time employees, from detailed sketches supplied by Anderson. The only qualified engineer who participated at all was Bodendoerfer, a machine designer, working on a two-piece cup machine for Mercury Engineering, and his work was confined to designing of the main drive and a portion of the paper feed structure. He also paid no attention to the project until late in the spring of 1956 after the machine had been pretty well designed when he noticed that the portions above referred to did not conform to the Mercury method of manufacturing. After bringing this to the attention of Donald Baumgartner, John Baumgartner's son, who was in charge of manufacturing for defendants, he was allowed to design those features. None of the drawings made by Bodendoerfer are among the drawings accused of being copied and Bodendoerfer never replaced Anderson as the engineer in charge of building the X–56, nor did either of the Baumgartners or Martin exercise any supervision over his work. Even when talk started among the draftsmen con-

cerning Anderson's "miraculous" ability to produce drawings practically overnight, caused the rumor to spread that Anderson may have been copying drawings from some source, came to the attention of John Baumgartner, no affirmative action to ascertain the truth of the rumor was taken.

According to the testimony of John Baumgartner, he asked his son, Donald Baumgartner, to look into the matter. Donald Baumgartner reported to John Baumgartner that upon inquiring of Anderson whether he was copying drawings, Anderson vehemently denied that he was copying. Nothing more was done. Baumgartner, Sr. never even questioned Anderson himself.

Russell Anderson did not appear as a witness at the trial. Portions of depositions taken before trial were introduced into evidence as well as an affidavit signed by Anderson after the commencement of this suit, in which he affirms that he designed the accused machines wholly from drawings given to him by Martin and represented by him to be the "Hooker" drawings. A thorough consideration of the evidence discloses that the deposition testimony of Russell Anderson cannot be believed in the light of all the facts established at the trial.

In view of the unreliability in many respects of the testimony at the trial of Ralph Martin, John Baumgartner, Sr., and the testimony by deposition of Russell Anderson, this court cannot make a categorical finding of how the Solo Cup drawings came into possession of the defendants. The record, however, does sustain the following ultimate finding, towit:

 The Solo Cup drawings or copies thereof which were used by Russell Anderson in his design of the defendants' X–56 machine came into possession of defendants in one of two ways, (1) They were procured by Russell Anderson from the plaintiff corporation in violation of his trust, or, (2) They were obtained by Ralph Martin at some time after 1952, and were not included in the set of drawings sold to Martin in 1949 by Harry Hooker.[2]

If the drawings were obtained by Ralph Martin, his failure to disclose how and in what way he had procured them coupled with his affirmative testimony that the only drawings he gave Anderson were those he had purchased from Hooker, compels the conclusion that he had procured them unlawfully, either by personal misappropriation or from some third person with knowledge that the third person had no right to them.

 In making this finding, we are mindful that the burden of proof on this count is with the plaintiff. However, the plaintiff has established to the satisfaction of this court that it had maintained a policy of secrecy with respect to its drawings, that it had never authorized the use of its drawings by defendant corporation or any other company, and that nevertheless, defendants had obtained and used the Solo drawings. Absent a satisfactory explanation by defendants for the use of the plaintiff's drawings under these circumstances, the plaintiff has discharged its burden.

 Under Erie R. R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L. Ed. 1188, the right to recover on the cause of action for unfair competition depends on the law of Wisconsin. There is a dearth of Wisconsin cases involving liability for misappropriation of trade secrets. However, the rules to be applied are the application of well-settled principles of tort law and we have been guided by the Restatement of the Law of Torts heretofore set out as well as decisions from other jurisdictions.

 Initially, it is necessary to clarify the liability of the defendant corporation for the acts of Russell Anderson. Under Wisconsin law and its general rules, a corporation is liable for torts of an agent acting within the scope of his employment. Morse v. Modern

---

**2.** Since some of the drawings of the X-56 reflect changes made by Solo Cup as late as 1952, the drawings must have been obtained after that date.

142

Woodmen of America, 166 Wis. 194, 164 N.W. 829. Anderson was hired by defendant corporation's predecessor for the specific purpose of designing a conical rolled rim cup machine similar to that of Solo Cup and was placed in complete charge of the project. We therefore hold that he was an agent of the corporation acting for it in the design of the X–56 machine, and any wrongful act committed by him is the act of the corporation. Thus, if it was Russell Anderson who procured the drawings and used them, it was an improper use in violation of the duty owed his former employer and he and the corporate defendant are liable under § 757(b), Restatement of the *Law of Torts*, in that the "use constitutes a breach of confidence reposed in him [Anderson] by the other [Solo Cup] in disclosing the secret to him."

If, on the other hand, it was Martin, a corporate officer, who procured the drawings used, the corporation is liable because he obtained them by "improper means", § 757(a), Restatement, or § 757(c) "he learned of the secret from a third person with notice of the facts that it was a secret, * * *"

 There remains the question of liability of the individual defendants, Ralph Martin and John Baumgartner, Sr. We hold that Ralph Martin, as the initiator of the entire X–56 project, the one who arranged the employment of Russell Anderson, the purchase of the Hooker drawings, and who negotiated the contract with Hudson Pulp & Paper Company in anticipation of Anderson's competency to duplicate the plaintiff's machine, was an actual participant in the tort, and therefore, liable. It is also our holding that John Baumgartner, Sr. is liable because he knew or should have known that the Solo Cup drawings were being used in the design of the X–56. His liability is analogous to the situation in which directors of a corporation have been held personally liable for conversion or misappropriation on the grounds of their negligence in the management and supervision of corporate affairs. See Annotations, 152 A.L.R. p. 696, at p. 712.

 Plaintiff is entitled to damages which it has sustained as a result of defendants' wrongful acts, and is also entitled to an injunction against the manufacture and sale of conical cup-making machines derived from use of plaintiff's drawings.

Counsel for the plaintiff, Solo Cup Company, will prepare findings of fact and conclusions of law pursuant to this Opinion and submit them to counsel for the defendants for approval as to form.